### HENRY FUGETT v. THE STATE.

#### No. 2850. Decided December 2, 1903.

**1.—Murder in First Degree—Jury Law—Race Discrimination.**

On the trial of a negro for the murder of his wife, where he was found guilty of murder in the first degree with penalty assessed at death, and it was contended that in the selection of the grand and petit juries there had been race discrimination against him, and it was proven by witnesses of unusual intelligence and standing that such was not the fact, one of whom was a negro physician, who stated "there were no negroes in Johnson County qualified to serve upon juries," and that he was acquainted practically with all of his race in the county; Held, the evidence wholly fails to show such discrimination in the matters complained of.

**2.—Evidence—Bill of Exceptions.**

Where a bill of exceptions is predicated alone upon certain questions asked a witness, and the same fails to set out the answer of the witness, or what his testimony would have been; Held, insufficient.

**3.—Same—Rebuttal Testimony—Material and Original.**

Where, on a trial for murder, appellant testified that he had not attempted to buy a knife from the witness B. a few days before the homicide,

and the witness B. testified that appellant had examined knives at his place, but did not buy, his objection being that they were not good steel; that he wanted a knife that would not bend or break; and the facts showed that subsequent to this investigation of the knives at B.'s appellant did buy a knife, which, on the day before the homicide, he ground very sharp, and shortly thereafter repaired to the place where his wife was, and cut her in a fearful manner, inflicting as many as half a dozen fatal wounds or stabs; Held, the evidence was clearly admissible in rebuttal of defendant's testimony, was material, and as original testimony to prove the purchase of the knife shortly before the killing.

**4.—Same—Former Difficulties—Remarks of District Attorney—Prejudice.**

See opinion for remarks made by the district attorney in argument to the jury, which, it was contended, prejudiced the rights of defendant before them, and which the court having instructed the jury at the time to disregard, giving written instructions to the same effect. Held, no prejudice is shown.

Appeal from the District Court of Johnson. Tried below before Hon. William Poindexter.

Appeal from a conviction of murder in first degree; penalty, death.

Appellant Henry Fugett was tried in the District Court of Johnson County at the term beginning on the 27th day of April, 1903, upon indictment charging him with the murder of Laura Fugett (his wife), by "then and there cutting and stabbing the said Laura Fugett with a knife." To this indictment, when arraigned, the defendant pleaded "not guilty." The jury found him guilty of murder in the first degree, assessing his punishment at death.

Appellant made a motion to quash the indictment in the court below on the ground of race discrimination in the appointment of jury commissioners, and in the selection by them of the grand and petit juries. Upon hearing this motion was overruled, the same having been contested by the State, and defendant excepted.

Appellant filed a motion and an amended motion for new trial, setting up therein as his main contention, that in the appointment of the jury commissioners for the selection of the grand jury that found and returned the indictment against him, "the African race, known as negroes, were discriminated against, in that no one of said race and color was selected as a member of said jury commission; that the defendant was and is of African descent, known as a negro." This motion was overruled; defendant excepted and gave notice in open court of appeal to the Court of Criminal Appeals.

The following is a condensed statement of the facts leading up to and attendant on the homicide:

J. A. Easterwood testified for the State: "I have lived in Johnson County for about thirty years. Live in East Cleburne. I remember the circumstance of the killing of Laura Fugett by defendant. I saw the defendant on that day, some fifteen or twenty minutes before the killing; something near 3 o'clock, I think. My attention was first attracted to some disturbance over at the house of Hamilton, defendant's father-in-law. Henry Fugett was running his wife, and I knew about some trouble between them before. The house belongs to me. I walked over there and told defendant he must not come there and raise a disturbance; that

Hamilton and his wife had a right to live there in peace. He said Laura was his wife and he loved her, and I told him that made no difference; that he must not raise a disturbance and must go away. He said all right, and went away. I started home; had gotten about 150 feet and looked back and saw his wife run out of the south door of the house, defendant after her. I walked back, supposing that he was going to give her a licking. Before I got there I heard her mother hallooing out, "He's killed her; he's killed her." When I got to within thirty or forty feet of them she was down on her hands and knees, moving her head, and it looked like her head was about half cut off. He was standing straddle of her, stabbing a butcher knife into her head and neck apparently as hard as he could drive it. With that knife (indicating knife in court). * * * Didn't hear defendant say anything except I thought I heard him say, 'You needn't get the officers; I'm coming to give up.' " On cross-examination he said: "Yes, when I told him he must leave there and not create any disturbance, he said that she was his wife, and he loved her."

Mollie Hamilton testified: "I am the mother of deceased, Laura Fugett. Laura had come to my house on Saturday evening before the killing on Wednesday, and had been there during that time. Before that time she had been living with her husband; had been married some three or four years. My husband and myself and Laura were there at home when defendant came about 2 o'clock. He came to the fence and told my husband he wanted to talk to him. I went to where they were, and he told my husband he wanted him to make Laura talk to him. My husband told him he could not make her talk to him. Defendant walked to the gate and Laura came out on the porch and defendant spoke to her, saying, 'Howdy.' She said nothing—just stood there. * * * After going away in about a quarter of an hour he came back. * * * He came in and went right on to her, and she ran out. He was talking to her at the fence when Mr. Easterwood came up and said he didn't want any rucus. He said no, he wouldn't, and went away. In about five minutes he came to the back door, came right on in and started to where Laura was, and she started to run, and he told her she needn't to run; he ran on after her and commenced killing her with the knife. He commenced stabbing her as soon as he got his hands on her. She gave a scream and said, 'Mamma, he's killing me.' He threw her down and got straddle of her and commenced stabbing her as hard as he could. I was hallooing and screaming and running back and forth. Defendant was stabbing her all the time as hard as he could. I was looking at him with all my eyes. * * * Laura died that night."

Cross-examined: "Laura had been at my house from Saturday until Wednesday, the day of the killing. I supposed she and defendant had separated at that time. I don't know the cause of their separation. It is a fact that my husband and I refused to let defendant talk to his wife. * * * I never heard her tell defendant that she had another

man to provide for her.   *   *   *   I never saw Laura running around; and don't know that she was a pretty hard customer."

S. B. Allen testified for defendant: "I am acquainted with defendant, and was also acquainted with deceased, Laura Fugett. Henry and Laura Fugett lived on my place as servants for my family. Defendant seemed very kind in his treatment towards his wife, but she seemed to be cross and ill to defendant. She would stay out all night often and come home about daylight and play sick on him and he would have to do the work."

Dr. Barnes (colored) recalled, testified for defendant: "I know by hearing others say, that the general reputation of deceased as to being a virtuous woman was not good."

Defendant, in his own behalf, testified in substance as follows: "My name is Henry Fugett, defendant in this case; was the husband of Laura Fugett, deceased. On the day of the killing I went to Mr. Hamilton, where my wife was staying, and had a talk with him; told him I wanted to talk with Laura and see if I couldn't make friends with her. I told him I loved her so hard; that I didn't love anybody else and I wanted to talk with her. He said I shouldn't talk to her, and I begged him to let me.   *   *   *   The mother also refused to let me talk to Laura or speak to her in any way.   *   *   *   I saw Laura coming out on the back gallery. Her mother told me not to speak to her. I said: 'Laura, don't do me that way. I love you and I want to speak with you.' She walked on to back of the house. I wanted to talk to her so bad I cried: I walked off.   *   *   *   I started up to Mrs. W's to see about cooking for her. Got the knife at a secondhand store to cut meat with. I sharpened it. I kept on wanting to see her so bad, I looked like I was almost going blind or crazy. But I couldn't, and I wanted to see her so bad. I concluded to go back and see if I could get to make friends with Mrs. Hamilton and to talk with Laura. When they saw me   *   *   *   her mother said to me, 'Go on back, you shan't talk to Laura.' Laura was sitting down and I walked up and put my hand on her shoulder and said: 'Howdy Laura?' I was crying at the time, and I said, 'Laura, please tell me howdy. Laura, I love you and I want you to tell me howdy.' Her mother kept on telling her not to tell me howdy. Said she would go out and get the officers to stop me. And I said: 'Mother, please don't do that; I love my wife and I want to talk to her. I tried to stay away, but I can't stay away from her.'   *   *   *   At the fence I asked her why she didn't come back home and stay, and she said she would if it hadn't been for her mamma. Mr. Easterwood came and told me not to raise any disturbance. I told him I wouldn't; I wanted to talk to her, and she said, 'I ain't going to do it; I got a friend to take care of me and get me everything.' It struck me so hard, I got mad and hit her. I couldn't stand it. Mrs. Hamilton was the cause of her leaving home. · It hurt me so bad I couldn't stand it any longer. She came out and seemed like I didn't hit her but once with the knife; once or twice. I didn't believe I hit her but once or twice. If I did, I didn't know any-

thing about it. I was almost crazy, I wanted to see her so bad. * * * I never did mention to anyone about going to kill her. I think any man who loved a woman like I did that one, and she spoke that way, would do about the same thing. Yes, sir; there were several people come to me and told me my wife was monkeying with other men, but I loved her so much I couldn't say anything to her about it. Nathen told me this. I knew the house right where she went."

Cross-examined: "I never thought of striking my wife until she said what she did about these other men. I didn't think about it when I bought this knife. I didn't think about it when I was sharpening this knife at the machine shop, and I didn't think about it when I was talking to Lon Covington, because I didn't talk to him about killing her. * * * I killed my wife because she told me——It struck me so hard, her speaking about she had some other man to take care of her. I never did go to the Cleburne furniture store and try and buy a knife. I did not try to get a knife at any other place that day. I do not know a man by the name of Boyd from whom I tried to buy a butcher knife."

Being recalled by his counsel, he said: "I had some difficulty with my wife prior to this last transaction. It was brought about by her running about and getting drunk and staying out late at night. She got mad at that time and wanted to jump on me and fight me. She kept running about all the time, and that is the cause of most of the trouble we had."

The testimony with regard to the knife, its purchase, sharpening, etc., is sufficiently set out in the opinion, and no further statement is required.

No brief for appellant found in the record.—Reporter.

*Howard Martin,* Assistant Attorney-General, for the State.—1. The court did not err in refusing to quash the indictment or special venire on the ground that appellant, a negro, had been intentionally discriminated against in the organization of the grand jury and the jury commission which selected the petit jury. The burden of proof was upon appellant to show that he had been intentionally discriminated against on account of his color in the formation of the grand jury and in the selection of the petit jury. This he failed to do. On the other hand the evidence affirmatively shows that he was not intentionally discriminated against in that respect. Hubbard v. State, 4 Texas Ct. Rep., 660; Parker v. State, 3 Texas Ct. Rep., 637; Martin v. State, 6 Texas Ct. Rep., 909.

2. In this connection, by bill number 2 appellant complains of the action of the court permitting the State to propound to witness Barnes the question if in his (witness') opinion there were among the negro voters of Johnson County any number who could read and interpret the charge of the court, etc. The bill is defective in not stating the answer of the witness. Besides, the question was a proper one.

3. The testimony of the witness J. M. Boyd, the admission of which

is complained of in bill number 3, was properly admitted. It showed preparation on the part of appellant to commit the crime, which was in rebuttal to testimony brought out by appellant, as shown by the court's qualification to the bill.

4. The argument of the county attorney in his closing argument to the jury complained of in bill number 4 was legitimate. But if it was not, it is not of that character to justify a reversal.

5. The evidence is amply sufficient to support the conviction. It discloses a most horrible and wanton murder, without showing any evidence in mitigation.

DAVIDSON, PRESIDING JUDGE.—This is a case in which a negro man was assessed the death penalty for killing his wife. A careful review of the testimony shows there has been no race discrimination in the selection of grand and petit juries in Johnson County; therefore, there was no error in overruling appellant's contentions along these lines. The witnesses introduced were men in the main of unusual intelligence and high standing. Among other witnesses was Dr. Barnes, a negro physician whose testimony was rather incisively to the effect that there were no negroes in Johnson County qualified to sit upon juries. He states that he was acquainted with practically all of his race in the county. Without going into the details, we hold the evidence fails entirely to show race discrimination in the matters about which complaint is made. This case perhaps is not as strong as either of the following: Hubbard v. State, 4 Texas Ct. Rep., 660; Parker v. State, 3 Texas Ct. Rep., 637; Martin v. State, 6 Texas Ct. Rep., 909.

While Barnes was testifying in behalf of appellant's motions to quash indictment and venire, he was asked if he "thought there were, among the colored voters of Johnson County, any number who could read and interpret the charge of the court, and as to his opinion as to the general qualification of the colored voters of Johnson County for jury service." The bill fails to set out the answer of the witness, or state what his testimony would have been. The error seems to be predicated entirely, so far as the bill is concerned, upon the question asked.

Witness Boyd was permitted to testify that he resided but was not in Cleburne at the time of the killing; was in Waxahachie; knew defendant; a few days before the killing appellant came to his place of business, and wanted to buy a butcher knife; he first called for Mr. Cyrus. "I showed defendant some knives, but he did not buy. His objection being that they were not good steel; that he wanted a knife that would not bend or break. He said he wanted it for a bread knife." That witness went to Waxahachie that night and heard of the killing while at Waxahachie, perhaps next day; that, to the best of his recollection, appellant was in his place of business looking at the knives two days before the killing. This was objected to because not in rebuttal, irrelevant, immaterial, and could only have the effect of prejudicing the jury against appellant. The

court qualifies the bill by stating that, while appellant was on the stand testifying in his own behalf, he denied trying to buy the knife from witness Boyd, and Boyd's testimony was introduced in rebuttal of that statement of appellant. This testimony is clearly admissible, in rebuttal of defendant's testimony, and is original evidence to prove the fact that defendant was endeavoring to purchase a knife shortly before the homicide. The testimony adduced on the trial is of that character which would have permitted its introduction from either standpoint.

The facts show that, subsequent to investigating the knives at Boyd's appellant bought a butcher knife, and the day of and preceding the homicide ground it very sharp; and, shortly afterward, went to where his wife was and cut her in a fearful manner, inflicting as many as a half dozen fatal stab wounds. If the fact that he was seeking to purchase this knife a day or two before the killing was of material character, it could be introduced at any time before the closing of the argument; for such is the provision of our statute.

The county attorney remarked to the jury in his argument: "The defendant's counsel could have asked defendant about his wife cutting him in former difficulties, but he failed to do so." One of the grounds of objection to this is that it was prejudicial in view of the fact that, while defendant was testifying in his own behalf, his attorneys were not permitted to prove by him facts and circumstances of former altercations, if any, between himself and his deceased wife. The court in his qualification says he did allow "defendant to testify to the cause of all difficulties between himself and deceased; but, as defendant testified he cut and stabbed her beacuse she said she could get another man to give her all she wanted, the particulars of injuries inflicted by one upon the other months and years before became wholly immaterial. There was nothing introduced making evidence of stabs inflicted by deceased upon defendant months and years before the homicide material."

As the record is, the use of this language did not prejudice, because the court instructed the jury at the time to disregard the remarks of the county attorney; and then gave a written instruction to the same effect. The evidence is ample, showing that appellant and his wife had had previous difficulties, and that perhaps she may have been the cause and produced the occasion and was the aggressor in some of the former difficulties, and had finally left him. The evidence is sufficient to support the judgment. It was a most brutal, savage killing. If there is any extenuating fact in the case, it is founded in his asserted love for and jealousy of his wife. It seems from the evidence that her reputation was not above suspicion in regard to chastity; in fact, the evidence on that point was damaging to the character of deceased; of all of which appellant seems to have been aware, and was the occasion of some, perhaps all, of their troubles. She had finally separated from him and refused to be reconciled. He undertook to buy a knife from Boyd a day or two before the killing; he failed to find one to suit his purpose. The day

of the killing he found one, and ground it until it was very sharp. Having done this, he repaired to the place where his wife was living, and butchered her in a most outrageous manner, cutting out her bowels, cutting her throat, and stabbing her in some sixteen places. Either of a half dozen of these wounds, the physicians say, was fatal. As we find the record there is no error, and the judgment is affirmed.

*Affirmed.*